IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DONALD R. LOVELL, ) | |
| ) | |
| Plaintiff, ) | Case No. 3:12-cv-254 |
| ) | |
| v. ) | Judge Sharp |
| ) | Magistrate Judge Bryant |
| CHAMPION CAR WASH, LLC, and ) | |
| TIM JONES, individually, ) | Jury Demand |
| ) | |
| Defendants. ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff Donald R. Lovell files this memorandum in support of his motion for summary judgment against Defendant Champion Car Wash, LLC (Defendant), on his disability discrimination claims under the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008, 42 U.S.C. § 12101 *et seq.* (ADA). As demonstrated below, Defendant discharged Mr. Lovell on the basis of an actual or perceived impairment and, further, failed to conduct the ADA-mandated individualized inquiry into his actual medical condition before discharging him. There are no genuine issues of material fact with respect to these claims and Mr. Lovell is entitled to judgment as a matter of law. Accordingly, he requests that the Court grant this motion and order that this case proceed to a hearing or trial on damages.

## FACTS

### I. Background

After working as a manger for Defendant Tim Jones' father's company, National Car Wash, for several years, Mr. Lovell worked as a car wash manager for Defendant Champion Car Wash from October 2007 until Defendant discharged him on or about June 19, 2011. (Jones Dep.

37-46, 89-90, 94).[1]  Defendant Jones is the owner and President of Defendant Champion. (Jones Dep. 11, 18-19).  At the time of Lovell's discharge Bennie Lay was Defendant's Operations Manager. (Jones Dep. 20, 24-25, 28, 41).

Defendant has five car washes in the Nashville and Gallatin, Tennessee, area. (Jones Dep. 25-26).  At the time of his discharge Lovell worked as an evening shift site attendant at the 6303 Charlotte Pike location. (Lovell Dep. 29-30).  Defendant has two shifts at its car washes, the "morning shift" and the "evening shift."  The morning shift is from 7:30 a.m. to 1:00 or 2:00 p.m. and the evening shift is from 1:00 or 2:00 p.m. to 8:00 p.m. (Jones Dep. 25, 31).

## II. Lovell's Impairments and Requests for a Transfer

Jones was aware that Lovell has had a heart condition his entire adult life and that he had multiple surgeries on his hip and total hip replacement surgery during his employment with Defendant. (Lovell Dep. 11, 21-23, 26-28, 36, 41, 69-70).  Jones testified:

> I know that he had – when he was 18 he had a problem with a staph infection getting in his heart and he had to have a valve replaced.  And I know he's been on Coumadin and other blood thinners to keep his blood thin.  And I know that his hip condition flared up on him in 2009, and he had to have that hip replaced.  Upon his last surgery that he had in December of 2010, I know that he developed some heart problems while he was in the hospital.

(Jones Dep. 54).  Jones also knew about "all the pain and everything he was going through" and that Lovell was seeing a both a cardiologist and an orthopedic surgeon. (Jones Dep. 54-55, 74).

In mid-June 2011, Lovell repeatedly requested a transfer to an available morning shift job at Defendant's Bellevue location as a reasonable accommodation of his medical condition. (Jones Dep. 56-58, 70-71, 74-75, 77-78; Lovell Dep. 31-33, 38, 57-59, 66-71).  The 6303 Charlotte Pike location where Lovell worked at the time had no air conditioning anywhere.

---

[1] Citations to deposition transcript pages and exhibits filed with this brief are by deponent name and page or exhibit number.

(Jones Dep. 58). The Bellevue location, however, had air conditioning in the "dog wash bay" and several restaurants around it. (Jones Dep. 57; Lovell Dep. 35, 43-44, 81-82). Jones denied Lovell's request for the available morning shift job at Bellevue and gave the job to Page Drake, a nondisabled, less senior employee who had not requested reasonable accommodation or opposed disability discrimination. (Jones Dep. 77-79, 127). Jones testified, "we were concerned about [Lovell] physically being able to do the job . . . ." (Jones Dep. 60).

### III. Lovell's Doctor Note and His Discharge

On June 17, 2011, Lovell provided Jones a note from his physician supporting his request for a transfer to the morning shift and stating, "Due to cardiomyopathy he should avoid heat of day due to risk of dehydration." (Jones Dep. 76, 81, Ex. 7). Jones admitted that the term, "heat of day" as used in the note was "not very clear." (Jones Dep. 82). Nevertheless, he 1) did not seek any clarification from Lovell's doctor about what he meant when he wrote the note, and 2) did not give Lovell a chance to obtain clarification as to what his doctor meant. (Jones Dep. 82, 93). Nor did he advise Lovell that he needed additional information from him or his doctor concerning any work restrictions or limitations on his activities. (Jones Dep. 82). Nor did he engage in the ADA-mandated, good-faith interactive process designed to identify reasonable accommodations of Lovell's impairment even though Lovell had requested a transfer to an available morning shift job as such an accommodation. (Jones Dep. 82-83, 56-58, 70-71, 75).

Instead, Jones "interpreted" the doctor's note without consulting the doctor or Lovell as to what it meant or, moreover, to obtain additional information as to Lovell's actual medical condition. (Jones Dep. 91, 94). Even though the words "heat of day" were "not very clear" to him, he "interpreted" them as broadly as possible to mean that Lovell could not perform his job "during any heat that may exist at any point during the day." (Jones Dep. 91, Ex. 10). He then

made the decision to discharge Lovell on June 17, typed a letter stating his reason for doing so on June 18, and presented it to and discharged Lovell on June 19, 2011. (Jones Dep. 89-90, 94, Ex. 10). Jones testified that when Lovell gave him his doctor's note on June 17, 2011, Jones "was worried, scared" and, "I was just scared because I had an employee that had given me this note. And I'm going, oh, my goodness, what if he keels over? What am I going to do?" (Jones Dep. 122, 124).

At the time that he discharged Lovell, Jones gave Lovell a letter dated June 18, 2011, that Jones had prepared himself. (Jones Dep. 89-90, 93-94, Ex. 11, Resp. to Request for Admission Nos. 4-5). The letter stated in pertinent part:

> I take health issues seriously, particularly heart related issues. Since I now have a doctor's note in my possession, liability for your heart issue is now passed along to me. If you got overheated while working at Champion Car Wash, and it caused further damage or injury to your heart, I would be liable and open to a lawsuit. . . . *Since you cannot perform your job duties as needed, I am going to have to release you, for medical reasons, from employment at Champion Car Wash*.

(Jones Dep. 89-91, Ex. 10) (emphasis added). Jones verified under oath that "everything in [his] June 18 letter [was] true and complete and correct to the best of [his] knowledge, information and belief." (Jones Dep. 115-16). Jones' "perception was that [Lovell] could not physically keep that car wash and perform the job duties at that car wash." (Jones Dep. 92).

Further, Operations Manager Lay gave a signed, handwritten statement on or about July 1, 2011 (see facsimile header), stating that Lovell "was released because of a medical condition" and "So for medical reasons and to avoid a Law-suit against the company Mr. Lovell was released." (Jones Dep. 98-99, Ex. 12). Lay also "[a]ttach[ed] a copy of Mr. Lovell's [June 18, 2011] release letter" from Jones to his signed statement. (Jones Dep. Ex. 12).

4

As of Jones' deposition on August 14, 2012, Defendant had no written reasonable accommodation or anti-disability discrimination policies in place. Additionally, Jones did not know what a "reasonable accommodation" is and had made no efforts to make himself or Defendant's employees aware of the requirements of the ADA. (Jones Dep. 35-36).

**ARGUMENT**

I. <u>**Summary Judgment Standard**</u>

With respect to motions for summary judgment, Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Rule 56 further provides that "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2).

Factual disputes that are irrelevant or that would not affect the outcome of the case are not "material" and cannot defeat a motion for summary judgment. There can be no "genuine" issue unless there is evidence that would enable a reasonable jury to return a verdict in favor of the opponent of the motion. Thus, absent specific evidence showing a genuine dispute over facts critical to the outcome of the case, summary judgment should be entered. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

## II. Defendant Discharged Lovell Because of An Actual or Perceived Impairment

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A plaintiff may establish disability discrimination by showing that (1) he is disabled within the meaning of the statute; (2) he was otherwise qualified to perform the essential functions of the job he held or desired, with or without reasonable accommodation; and (3) he suffered an adverse employment action because of a disability. *Henderson v. Ardco, Inc.*, 247 F.3d 645, 649 (6th Cir. 2001).

Lovell need not show that his actual or perceived impairment was the "sole" reason that Defendant discharged him; rather, he need only show that it had "a determinative influence" on that decision. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc) (adopting *Gross v. FBL* standard for use in ADA cases); *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 176 (2009) (describing but-for cause as one that "had a determinative influence on the outcome"); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) ("liability depends on whether the protected trait actually motivated the employer's decision.' . . . That is, the plaintiff's [disability] must have 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.'") (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

### A. Lovell was Disabled within the Meaning of the ADAAA

"The term 'disability' means, with respect to an individual – (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described

in paragraph (3))." 42 U.S.C. § 12102(1). Under the ADAAA, which became effective January 1, 2009, and applies to this case, "being regarded as having such an impairment" simply means that the individual "has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not* the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A) (emphasis added). Indeed, as of 2009, whether an individual's impairment "substantially limits" a major life activity is "not relevant" to coverage under the regarded as prong. 29 C.F.R. § 1630.2(j)(2). Under the ADAAA's implementing regulations:

> (1) . . . [A]n individual is 'regarded as having such an impairment' if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, *whether or not* that impairment substantially limits, or is perceived to substantially limit, a major life activity. Prohibited actions include but are not limited to . . . termination . . . or denial of any other term, condition, or privilege of employment.
>
> (2) . . . [A]n individual is "regarded as having such an impairment" *any time* a covered entity takes a prohibited action against the individual because of an actual or perceived impairment, *even if* the entity asserts, or may or does ultimately establish, a defense to such action.

29 C.F.R. § 1629.2(l) (emphasis added). Thus, under the ADAAA, an individual need only be perceived as having "an impairment" to recover under the "regarded as" prong. The regulations define "physical or mental impairment" as "*[a]ny physiological disorder or condition . . . affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, endocrine . . . .*" 29 C.F.R. § 1630.2(h)(1) (emphasis added).

7

Jones was aware that Lovell has had a heart condition his entire adult life and that he had multiple surgeries on his hip and total hip replacement surgery during his employment with Defendant. (Lovell Dep. 11, 21-23, 26-28, 36, 41, 69-70). Jones testified:

> I know that he had – when he was 18 he had a problem with a staph infection getting in his heart and he had to have a valve replaced. And I know he's been on Coumadin and other blood thinners to keep his blood thin. And I know that his hip condition flared up on him in 2009, and he had to have that hip replaced. Upon his last surgery that he had in December of 2010, I know that he developed some heart problems while he was in the hospital.

(Jones Dep. 54). Jones also knew about "all the pain and everything he was going through" and that Lovell was seeing a both a cardiologist and an orthopedic surgeon. (Jones Dep. 54-55, 74). Moreover, he knew that in mid-June 2011, Lovell repeatedly requested a transfer to an available morning shift job at Defendant's Bellevue location as a reasonable accommodation of his impairment. (Jones Dep. 56-58, 70-71, 74-75, 77-78; Lovell Dep. 69-70). Jones denied the request and gave the job to Page Drake, a nondisabled, less senior employee who had not requested reasonable accommodation or opposed disability discrimination. (Jones Dep. 77-79, 127). Jones testified, "we were concerned about him physically being able to do the job . . . ." (Jones Dep. 60).

On June 17, 2011, Lovell provided Jones a note from his physician supporting his request and stating, "Due to cardiomyopathy he should avoid heat of day due to risk of dehydration." (Jones Dep. 76, 81, Ex. 7). Jones then revealed his perception that Lovell had an impairment in his June 18, 2011, discharge letter to Lovell (Jones Dep. Ex. 10) and when he testified, "My perception was that he could not physically keep that car wash and perform the job duties at that car wash." (Jones Dep. 92).

There is no question that Lovell had an impairment under 29 C.F.R. § 1630.2(h)(1) and that Jones knew about it and expressly relied upon it when he discharged him on June 19, 2011. (Jones Dep. Exs. 10, 12). Thus, irrespective of whether his impairment substantially limited or was perceived to substantially limit a major life activity, which is irrelevant to the "regarded as disabled" analysis under the ADAAA, Lovell was disabled within the meaning of the statute.

### B. Lovell Presents Direct Evidence that Defendant Discharged Him Because of An Actual or Perceived Impairment

Jones' June 18, 2011, discharge letter to Lovell and Operations Manager Lay's signed statement explaining that Lovell was discharged "for medical reasons" and nothing else constitute overwhelming direct evidence of disability discrimination under the ADAAA. "A plaintiff may prove that he was discriminated against based upon his disability either through direct or indirect evidence." *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004). "'The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both.'" *Id.* (citation omitted). Direct evidence in a disability discrimination case is evidence that allows a fact finder to conclude, without having to draw inferences, that the employer took an adverse action against an employee because of a disability. *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 869 (6th Cir. 2007). Stated differently, "Direct evidence of discrimination is 'that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (citation omitted). "Such evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled.'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998); *Todd v. City of Cincinnati*, 436 F.3d 635, 637-38 (6th Cir. 2006) ("in 'direct evidence' cases . . . the plaintiff must show that the employer 'relied' on the disability in making its decision") (citation

9

omitted). "When an employer admits (or the evidence establishes) that its decision was based upon the employee's disability, direct evidence of discrimination exists [and] . . . application of the *McDonnell Douglas* burden-shifting framework is inappropriate." *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1180 (6th Cir. 1996) (emphasis added); *Kleiber*, 485 F.3d at 869 ("When an ADA plaintiff premises his claim upon direct evidence, we jettison the familiar *McDonnell Douglas* burden-shifting framework applicable in indirect-evidence cases . . . .").

In this case, there is indisputable direct evidence that Defendant discharged Lovell because of an actual or perceived impairment. At the time that he discharged Lovell, Jones gave Lovell a letter dated June 18, 2011, that Jones had prepared himself. (Jones Dep. 89-90, 94, Ex. 11, Resp. to Request for Admission Nos. 4-5). The letter stated in pertinent part:

> I take health issues seriously, particularly heart related issues. Since I now have a doctor's note in my possession, liability for your heart issue is now passed along to me. If you got overheated while working at Champion Car Wash, and it caused further damage or injury to your heart, I would be liable and open to a lawsuit. . . . *Since you cannot perform your job duties as needed, I am going to have to release you, for medical reasons, from employment at Champion Car Wash.*

(Jones Dep. 89-91, Ex. 10) (emphasis added). Jones verified under oath that "everything in [his] June 18 letter [was] true and complete and correct to the best of [his] knowledge, information and belief." (Jones Dep. 114-16). As to his perception of Lovell's physical abilities, Jones elaborated, "My perception was that he could not physically keep that car wash and perform the job duties at that car wash." (Jones Dep. 92). Thus, Jones perceived Lovell as having an impairment. To be sure, Jones testified that when Lovell gave him his doctor's note on June 17, 2011, Jones "was worried, scared" and, "I was just scared because I had an employee that had given me this note. And I'm going, oh, my goodness, what if he keels over? What am I going to do?" (Jones Dep. 122, 124). That next day, Jones penned the discharge letter stating that he

10

feared he "would be liable and open to a lawsuit" and admitting in plain English that he was discharging Lovell "for medical reasons." (Jones Dep. 89-90, 93-94).

Furthermore, Defendant's Operations Manager, Lay, gave a signed, handwritten statement on or about July 1, 2011 (see facsimile header), stating that Lovell "was released because of a medical condition" and "So for medical reasons and to avoid a Law-suit against the company Mr. Lovell was released." (Jones Dep. 98-99, Ex. 12). Lay also "[a]ttach[ed] a copy of Mr. Lovell's [June 18, 2011] release letter" from Jones to his signed statement. (Jones Dep. Ex. 12). Accordingly, at the time it made the decision, Defendant discharged Lovell because of an actual or perceived impairment.

### C. Defendant Cannot Meet Its Burden of Persuasion

The above documentary evidence and party admissions are direct evidence that Defendant discharged Lovell because of an actual or perceived impairment. *Wexler*, 317 F.3d at 570; *Hedrick*, 355 F.3d at 452. Accordingly, the burden of proof – not just production – "shifts to the defendant to show that it would have terminated the plaintiff's employment had it not been motivated by discrimination." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999); *Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000) (when plaintiff presents direct evidence, "[t]he burden of persuasion then shifts to the defendant to show that it would have terminated the plaintiff's employment absent the discriminatory motive."); *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002) ("an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive."). The distinction between direct and indirect evidence cases is

critical because in indirect cases, "the burden of persuasion stays with the plaintiff throughout the *McDonnell Douglas* analysis; in contrast, the defendant in a direct evidence case has the burden to show that its stated reason for acting against the plaintiff *was not pretextual*." *Erwin v. Potter*, 79 Fed. Appx. 893, 899 (6th Cir. Nov. 4, 2003) (emphasis added) (citing *Weberg*, 229 F.3d at 522-23). The en banc Sixth Circuit has emphasized:

> This court has distinguished the defendant's burden of *disproving* intentional discrimination supported by the plaintiff's *direct* evidence, from the defendant's burden of *production* to rebut a sustainable *circumstantial* inference of intentional discrimination: "Once the district court accepts the plaintiff's *direct evidence*, the employer's asserted nondiscriminatory reason, which is merely a burden of production under the *McDonnell Douglas* [circumstantial evidence] framework . . . essentially becomes *an affirmative defense upon which the employer bears the burden of proof*."

*Wexler*, 317 F.3d at n. 10 (quoting *Weberg*, 229 F.3d at 522-23) (emphasis in original).

Defendant cannot prove by a preponderance of the evidence that, *at the time that it discharged Lovell*, it would have discharged him absent his actual or perceived impairment. In addition to the multiple signed, contemporaneous, verified, written sources of direct evidence above, Defendant never stated that it discharged Lovell for any reason other than "medical reasons" until its attorney submitted a contradictory position statement to the EEOC over 90 days later on September 27, 2011. (Jones Dep. 96, 107-108 – lines 16-25 and 1-6, Ex. 16). The position statement says nothing about Lovell being fired "for medical reasons," but asserts for the first time ever that "Because Lovell was insubordinate and stated that he would not report to or work with Lay, Tim Jones terminated the employment of Lovell" and "Lovell was terminated because he refused to comply with a direct order to report for work to his immediate Supervisor and Operations Manager, Lay." (Jones Dep. 105-06, Ex. 16 at p. 3, ¶¶4-5). These long-after-the-fact, inconsistent lawyer arguments are insufficient to carry Defendant's burden of persuasion.

12
Case 3:12-cv-00254  Document 38  Filed 02/18/13  Page 12 of 19 PageID #: 291

It is axiomatic that "the ultimate issue is the employer's reasoning at the moment the questioned employment decision is made." *Patrick v. Ridge*, 394 F.3d 311, 319-20 (5th Cir. 2004). As shown above, there is no *genuine* issue of material fact as to what motivated Defendant *at the time* that it discharged Lovell. The Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), is instructive. There the Court held that an employer *cannot* prevail "by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision." *Id.* at 252. The Court further observed that "proving 'that the same decision would have been justified . . . is not the same as proving that the same decision would have been made'" and "[t]he employer . . . must show that its legitimate reason, standing alone, would have induced it to make the same decision." *Id.* (citation omitted); *see also Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 709 (Tenn. 2000) (stating in TDA case, "Under the direct method approach [defendant] must still establish that the same decision would have been made absent any improper motivation. A mere showing that the decision would have been justified is insufficient."). These pronouncements are fatal here.

In light of the overwhelming, verified direct evidence from the decisionmaker at the time that he made the challenged decision, Defendant cannot meet its burden of proving, by a preponderance of the evidence, that it "would have" discharged Lovell when it did so absent his actual or perceived impairment. To be sure, neither this Court nor a reasonable jury could conclude that Defendant did *not* discharge Lovell because of his actual or perceived impairment. The contemporaneous documentary evidence shows beyond peradventure that that impairment had "a determinative influence" on the discharge decision at the time it was made.

Other courts have directed that judgment be entered in favor of the plaintiff in cases in which no reasonable jury could find in favor of the defendant on its proffered reason for its

13
Case 3:12-cv-00254 Document 38 Filed 02/18/13 Page 13 of 19 PageID #: 292

adverse employment decision. *See Jones v. Nissan N. Am., Inc.*, 438 Fed. Appx. 388, 402 (6th Cir. 2011) (directing that JMOL be entered in favor of plaintiff in pre-ADAAA "regarded as" disabled case on basis that "it is undisputed that Nissan regarded Jones has having physical/medical restrictions rendering him unable to perform his job."); *Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468, 480-81, 484 (5th Cir. 2006) (same); *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1040-41 (2nd Cir. 1993) (directing that judgment be entered in favor of plaintiff because defendant could not meet its burden of proof and observing, "It is reasonable that the employer 'bear the risk that the influence of legal and illegal motives cannot be separated, because he knowingly created the risk and because the risk was created not by innocent activity but by his own wrongdoing.'") (quoting *Price Waterhouse*, 490 U.S. at 250); *Williams v. The Nashville Network*, 132 F.3d 1123, 1132-33 (6th Cir. 1997) (reversing jury verdict for defendant and directing that JMOL be entered in favor of plaintiff because defendant did not offer legitimate reason "that a reasonable juror could credit" and because "as a matter of law . . . a juror could reasonably conclude only that the company's proffered reasons . . . were pretextual."); *Simpson v. Diversitech*, 945 F.2d 156, 160 (6th Cir. 1991), *reh'g denied*, *cert. dismissed*, *superseded on other grounds by* 42 U.S.C. § 2000e-2(m) (holding employer could not meet its burden of proof and directing that judgment be entered in favor of plaintiff); *Milligan-Jensen v. Michigan Tech. Univ.*, 767 F. Supp. 1403, 1415-16 (W.D. Mich. 1991), *rev'd on other grounds* ("As in *Hopkins*, this court cannot separate the good from the bad . . . . Defendant bore the burden of persuading the court that sex discrimination did not infect the decision to dismiss plaintiff. Defendant failed to carry its burden. Therefore . . . the court concludes that defendant did in fact discriminate against plaintiff").

Lovell respectfully requests that this Court do the same. This is a unique case involving indisputable direct evidence of discriminatory intent and a defendant who cannot prove that the plaintiff's impairment did not have "a determinative influence" on its discharge decision at the time that it made it. Thus, Lovell is entitled to summary judgment on his disability discrimination claim.

### III. Defendant Violated the ADA by Failing to Conduct An Individualized Inquiry Into Lovell's Actual Medical Condition Before Discharging Him

Even if Defendant could prove by a preponderance of the evidence that Lovell's impairment did not have a determinative influence on its June 19, 2011, discharge decision, which it cannot do, Lovell remains entitled to summary judgment on other grounds. Indeed, Defendant violated the ADA when it made a snap decision to discharge Lovell for the reason explained in its June 18, 2011, discharge letter without first conducting any inquiry into Lovell's actual medical condition and his ability to continue performing his job, with or without reasonable accommodation. (Jones Dep. 114-16, Ex. 10).

In *Holiday v. City of Chattanooga*, 206 F.3d 637 (6th Cir. 2000), the court held that, with respect to "regarded as" discrimination under the ADA, an employer is *required* to conduct an "individualized inquiry" into the plaintiff's "actual medical condition" before taking an adverse employment action:

> The ADA mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position. In order to properly evaluate a job applicant on the basis of his personal characteristics, the employer *must conduct an individualized inquiry into the individual's actual medical condition*, and the impact, if any, the condition might have on that individual's ability to perform the job in question.

*Holiday*, 206 F.3d at 643 (emphasis added).

Similarly, in *Jones v. Nissan N. Am., Inc.*, 438 Fed. Appx. 388 (6th Cir. 2011), the court stated that "[t]he law is clear that an employer cannot simply rely on a third-party's assessment that an employee is disabled. . . . It is clear that had a doctor used the same words as the chancellor used, [the defendant] would have been *obligated to look beyond its perception of the doctor's conclusions and make an individualized assessment* of [the plaintiff]'s abilities." *Jones*, 438 Fed. Appx. at 401 (emphasis added) (citing *Holiday*, 206 F.3d at 643-44, and cases cited therein). The court observed, "Were employers permitted to infer an inability to do the job based on [third-party statements], the purposes of the ADA would be undermined."

Most recently, in *Keith v. County of Oakland*, ___ F.3d ___, No. 11-2276, 2013 U.S. App. LEXIS 595 (6th Cir. Jan. 10, 2013), the court recognized that:

> As a threshold matter, "[t]he ADA mandates an individualized inquiry in determining whether an [applicant's] disability or other condition disqualifies him from a particular position." A proper evaluation involves consideration of the applicant's personal characteristics, his actual medical condition, and the effect, if any, the condition may have on his ability to perform the job in question. This follows from the ADA's underlying objective: "people with disabilities ought to be judged on the basis of their abilities; they should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged on the relevant medical evidence and the abilities they have." The ADA requires employers to act, not based on stereotypes and generalizations about a disability, but based on the actual disability and the effect that disability has on the particular individual's ability to perform the job.

*Keith*, ___ F.3d ___, 2013 U.S. App. LEXIS 595, at *13-14 (quoting *Holiday*, 206 F.3d at 643). The *Keith* court reaffirmed that "employers cannot escape liability under the ADA merely by mechanically relying on the medical opinions and advice of third parties." *Id.* at *17 (citing *Holiday*, 206 F.3d at 645).

In this case, Jones received Lovell's doctor's note on June 17, 2011, stating, "Due to cardiomyopathy, he should avoid heat of day due to risk of dehydration." (Jones Dep. 76, 81, Ex. 7). Jones admitted that the term, "heat of day" as used in the note was "not very clear." (Jones Dep. 82). Nevertheless, he 1) did not seek any clarification from Lovell's doctor about what he meant when he wrote the note, and 2) did not give Lovell a chance to obtain clarification as to what his doctor meant. (Jones Dep. 82, 93). Nor did he advise Lovell that he needed additional information from him or his doctor concerning any work restrictions or limitations on his activities. (Jones Dep. 82).[2] Nor did he engage in the ADA-mandated, good-faith interactive process designed to identify reasonable accommodations of Lovell's impairment even though Lovell had repeatedly requested a transfer to an available morning shift job as such an accommodation. (Jones Dep. 82-83, 56-58, 70-71, 75).[3]

Instead, Jones "interpreted" the doctor's note without consulting the doctor or Lovell as to what it meant or, moreover, to obtain additional information as to Lovell's "actual medical condition" as required by the ADA. (Jones Dep. 91, 94). Even though the words "heat of day" were "not very clear" to him, he "interpreted" them as broadly as possible to mean that Lovell could not perform his job "during any heat that may exist at any point during the day" and to the detriment of Lovell. (Jones Dep. 91, Ex. 10). He then made the snap decision to discharge Lovell on June 17, typed a letter stating his reason for doing so on June 18, and presented it to

---

[2] Courts hold that where doctor notes are vague, employers should "'contact the employee's health care provider with the employee's permission, for purposes of clarification of the employee's fitness to return to work.'" *Brumbalough v. Camelot Care Centers, Inc.*, 427 F.3d 996, 1003 (6th Cir. 2005) (quoting 29 C.F.R. §825.310(c)).

[3] Defendant faces liability for its admitted failure to engage in the mandatory good-faith interactive process and/or for failing to accommodate Lovell, as well. *Barnett v. U.S. Air, Inc*., 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *jmt. vac'd on other grounds*, 535 U.S. 391 (2002) (Employers "who fail to engage in the interactive process in good faith [] face liability if a reasonable accommodation would have been possible."); *Kleiber v. Honda of Am. Mfg*., 485 F.3d 862, 869-71 (6th Cir. 2007) (holding, "'An employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the Company for which that employee is otherwise qualified'" and, "Where the requested accommodation is a job transfer, 'employers have a duty to locate suitable positions for' employees with disabilities.") (quoting *Burns v. Coca-Cola Enters., Inc*., 222 F.3d 247, 257-58 (6th Cir. 2000)); *see also* 42 U.S.C. § 12111(9)(B) ("reassignment to a vacant position" is a reasonable accommodation).

17

and discharged Lovell on June 19, 2011. (Jones Dep. 89-90, 94, Ex. 10). And he admittedly did so without first conducting the required individualized assessment of Lovell's actual medical condition and abilities because he "was worried, scared" and, "I was just scared because I had an employee that had given me this note. And I'm going, oh, my goodness, what if he keels over? What am I going to do?" (Jones Dep. 122, 124).[4] This is precisely the type of decision making – *i.e.*, that based on "fear," "ignorance" and "generalizations" about a person's medical condition – that the ADA prohibits. *Jones*, 438 Fed. Appx. at 401-02 (holding defendant violated ADA by failing to conduct mandatory individualized assessment of plaintiff's actual medical condition and abilities and directing that judgment be entered in his favor); *Rodriguez.*, 436 F.3d at 480-81, 484 (same). Accordingly, Defendant violated the ADA and Lovell is entitled to summary judgment.

## CONCLUSION

For these reasons, Lovell respectfully requests that the Court grant his motion for summary judgment as to Defendants' liability under the ADA and direct that this case proceed to a hearing or trial for a determination of damages.

---

[4] Jones' "requir[ing] that [Lovell] give [him] a letter from [his] heart doctor and . . . from [his] orthopedic surgeon stating that [Lovell] . . . *had no restrictions*" as a condition of continued employment constitutes a *per se* violation of the ADA. (Jones Dep. 74, 55). Such a "requirement" fails to take into consideration whether Lovell may be able to work with a reasonable accommodation. *McGregor v. Nat'l RR Passenger Corp.*, 187 F.3d 1113, 1115-16 (9th Cir. 1999) ("A '100% healed' or 'fully healed' policy discriminates against qualified individuals with disabilities because such a policy permits employers to substitute a determination of whether a qualified individual is '100% healed' from their injury for the *required individual assessment* whether the qualified individual is able to perform the essential functions of his or her job either with or without reasonable accommodation.") (listing cases).

Respectfully submitted,

s/Douglas B. Janney III
Douglas B. Janney III (BPR No. 19112)
2002 Richard Jones Road
Suite B-200
Nashville, Tennessee 37215
(615) 742-5900

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I certify that I electronically filed and served this Memorandum in Support of Motion for Summary Judgment using the Court's CM/ECF system upon Richard J. Braun, Braun & Associates, PLLC, 501 Union Street, Suite 500, Nashville, Tennessee 37219 on February 18, 2013.

s/Douglas B. Janney III
Douglas B. Janney III