UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| DONALD R. LOVELL, | ) |  |
|---|---|---|
| Plaintiff, | ) |  |
| v. | ) | No: 3:12-00254 |
|  | ) | Judge Sharp |
| CHAMPION CAR WASH, LLC, and TIM JONES, individually, | ) |  |
| Defendants. | ) |  |

## MEMORANDUM

Plaintiff Donald R. Lovell sued Defendants Champion Car Wash, LLC and Tim Jones, claiming that he was terminated from employment in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, the Tennessee Disability Act, Tenn. Code Ann. § 8–50–103, and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* He also claims that he was retaliated against for engaging in protected activity.

Pending before the Court are fully briefed Cross-Motions for Summary Judgment (Docket Nos. 34 & 37). For the reasons that follow, the Court will grant summary judgment in Plaintiff's favor on his disability discrimination claim under the ADA, but deny the remainder of the summary judgment motions.

## I. FACTUAL BACKGROUND

Champion operates five car washes in the Nashville and Gallatin, Tennessee area. It is owned by Tim Jones, who also serves as its President. Bennie Lay is the Operations Manager.

All five car washes have two shifts. The morning shift runs from 7:30 a.m. to 1:00 or 2:00

1

p.m., and the evening shift runs from 1:00 or 2:00 p.m. to 8:00 p.m.

Plaintiff began working for Champion in October 2007, having previously worked as a manager at National Car Wash, which was owned by Jones' father. At the time of his discharge on June 19, 2011, Jones worked as an evening shift site attendant at the Champion car wash located at 6303 Charlotte Pike. That facility has no air conditioning.

In early June 2011, Plaintiff requested a transfer to an available morning shift job at Defendants' Bellevue location, which has air conditioning in the "dog wash bay." Plaintiff claims that the request was made as a reasonable accommodation for his medical conditions, but Defendants assert that the request was made solely because Plaintiff wanted to work the first shift.

Jones denied Lovell's request for the morning shift job at Bellevue on June 10, 2011. That same day, Plaintiff was given a "Constructive Advice Form," which counseled Plaintiff about being rude to customers.

Page Drake, a non-disabled, less senior employee was given the morning shift job at the Bellevue location. In his deposition, Jones conceded that he was concerned about Plaintiff being physically able to do the job because that position is more physically demanding, and Plaintiff did not perform well when he had worked at that location in the past.

Jones was aware that Lovell has had a heart condition his entire adult life, and that he had multiple surgeries on his hip and total hip replacement surgery during his employment with Defendant. In his deposition, Jones testified:

> I know that he had when he was 18 he had a problem with a staph infection getting in his heart and he had to have a valve replaced. And I know he's been on Coumadin and other blood thinners to keep his blood thin. And I know that his hip condition flared up on him in 2009, and he had to have that hip replaced. Upon his last surgery that he had in December of 2010, I know that he developed some heart problems while he was in the hospital.

2

(Docket No. 40-1, Jones Depo. at 54). Jones also knew that Plaintiff suffered pain and was seeing both a cardiologist and an orthopedic surgeon.

During his employment, Plaintiff took several medical leaves. In 2008 he had hip surgery, was absent from work for weeks, and Defendant held his position open. In 2009, Plaintiff had two additional surgeries that kept him out of work for weeks, but again he returned to work at Champion. Then, in 2010, he had yet another surgery that kept him out of work for several weeks but, again, he went back to work for Defendants. It was agreed at that time that Plaintiff would work at the Charlotte Pike car wash for $12 per hour.

On June 17, 2011, Plaintiff gave Jones a note from his physician that stated: "Due to cardiomyopathy he should avoid heat of day due to risk of dehydration." (Docket No. 40-2 at 21). According to Jones, the statement "heat of day" as used in the doctor's note was "not very clear." (Docket No. 40-1, Jones Depo. at 82). He did not, however, seek any further clarification, or advise Plaintiff that he needed additional information from him.[1] Rather, he interpreted the doctor's note to mean that Plaintiff could not perform his job "during any heat that may exist at any point during the day." (Id. at 92).[2]

Jones made the decision to terminate Plaintiff on June 17, 2011. The following day, he drafted a letter setting forth his reasons and presented the same to Plaintiff on June 19, 2011. The letter stated in part:

I take health issues seriously, particularly heart related issues. Since I now have a

---

[1] At the time, Champion had no written reasonable accommodation or anti-disability discrimination policies in place.

[2] Jones testified that, when Plaintiff gave him the doctor's note, he (Jones) "was worried, scared" and, "I was just scared because I had an employee that had given me this note. And I'm going, oh, my goodness, what if he keels over? What am I going to do?" (Id. at 122 &124).

> doctor's note in my possession, liability for your heart issue is now passed along to me. If you got overheated while working at Champion Car Wash, and it caused further damage or injury to your heart, I would be liable and open to a lawsuit.
>
> Frankly, I do not have any jobs available that would preclude you from working in the heat of the day. In the summertime, as recently demonstrated, temperatures can easily reach 90+ degrees as early as 9-10 am and last until late in the evening. Those words from your doctor "he should avoid the heat of the day . . ." prevent you from performing your job duties during any heat that may exist at any point during the day. For personal and legal reasons, I must take your doctor's note seriously.
>
> Since you cannot perform your job duties as needed, I am going to have to release you, for medical reasons, from employment at Champion Car Wash. . . .

(Docket No. 40-2 at 33). In his deposition, Jones testified that he believed Plaintiff could not physically perform the job duties at the Charlotte Pike car wash because there were no jobs there where one could work and avoid the heat.

In accordance with the letter, Plaintiff was terminated from employment on June 19, 2011. The parties agree that, at that time, Plaintiff could perform his job at the Charlotte Pike Car Wash with or without accommodation.

Plaintiff did not disclose to his doctor, or to Defendants, that he kept cold bottled water with him on the job site. Plaintiff never suffered from dehydration while working at the Charlotte Pike car wash. However, his breathing was impacted on three to four occasions in June 2011.[3]

On June 21, 2011, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission and the Tennessee Human Rights Commission, claiming disability discrimination and retaliation. In the charge, Plaintiff wrote:

---

[3] Defendants assert that "the only life activity impacted by Lovell's medical problem is his breathing," and that "his breathing problems occur very infrequently [and] only in extreme heat and, thus, are neither severe nor permanent enough to constitute a disability[.]" In support of that positions, Defendants point to Plaintiff's medical records from March to April 2011, which generally show that his respiration was "non-labored" upon examination, and that his "breath sounds" were "clear throughout and wheezes absent." (Docket No. 59-1 at 1-11).

4

> I am an individual with a disability. On June 10, 2011, I requested a reasonable accommodation of relocating to another site where there was a position available on day shift rather than evening shift. I provided a note from my doctor. My request was denied. I informed my employer that I would be filing an EEOC complaint. The next day I received a write-up, a demotion, and a cut in pay. Approximately 5 days later, I was terminated.

(Docket No. 40-2 at 42).

On July 1, 2011, and in response to an unemployment claim, Operations Manager Lay wrote out a handwritten statement in which he stated that Plaintiff "was released because of a medical condition," and to avoid a lawsuit. Lay also wrote, however, that, notwithstanding a prior "Doctor's note," Plaintiff continued to sit out in the direct sunlight, that Plaintiff was told by Lay not to do so, but that, in defiance of those instructions, Plaintiff continued to sit out in the sun. (Docket No. 40-2 at 32).

In August 2011, Plaintiff filed for social security disability benefits, having previously told Jones back in December 2010 that he was considering filing for those benefits. His claim initially was denied and he challenged that determination in both December 2011 and February 2012, claiming that he was "disabled and cannot work." (Docket No. 60-1 at 2 & 4).

## II. APPLICATION OF LAW

As indicated, the parties have filed Cross-Motions for Summary Judgment. Because the standards governing motions for summary judgment are well known, the Court will not reiterate them here other than to say that "[t]he standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." Ferro Corp. v. Cookson Group, PLC, 585 F.3d 946, 949 (6th Cir. 2009).

As for the Motions themselves, Plaintiff seeks partial summary judgment only on his disability claim under the ADA. Defendants seek summary judgment on all of Plaintiff's claims,

5

which include both disability and retaliation claims under the ADA, TDA, and the THRA.[4]

A. **Disability Discrimination Under the ADA**

The ADA prohibits covered employers from discriminating against a "qualified individual on the basis of disability" with regard to hiring, advancement, training, termination, and "other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A plaintiff may seek to prove such a claim either through direct or indirect evidence.

"To make out a *prima facie case* of employment discrimination through indirect evidence under [the ADA], a plaintiff must show that '1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.'" Whitfield v. Tennessee, 639 F.3d 253, 258-59 (6th Cir. 2011). (quoting, Macy v. Hopkins Cnty. Sch. Bd. of Educ., 484 F.3d 357, 365 (6th Cir. 2007)). "Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason' for its actions." Talley v. Family Dollar Stores of Ohio, Inc., 542 F.3d 1099, 1105 (6th Cir. 2008) (quoting, Gribcheck v. Runyon, 245 F.3d 547, 550 (6th Cir. 2001). "If the defendant can satisfy its burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." Id.

---

[4] The same general elements apply whether the claim is under the ADA or the TDA, although the TDA does not require a reasonable accommodation. Cadenas–Meade v. Pfizer, Inc., 510 Fed. Appx. 367, 369 & fn. 3 (6th Cir. Jan. 4, 2013). Plaintiff's THRA claims are duplicative of his TDA claims because the latter "embodies the definitions and remedies provided by the [THRA]." Barnes v. Goodyear Tire & Rubber Co., 48 S.W.3d 698, 705 (Tenn. 2000).

Alternatively, a plaintiff may prove a disability discrimination case based upon direct evidence. "Where the ADA claim is based on direct evidence of discrimination, the initial burden is on the plaintiff to show that []he (1) has a disability, and (2) is 'otherwise qualified' for the position, either '(a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation.'" Kempter v. Michigan Bell Telephone Co., 2013 WL 4504760 at *3 (6th Cir. Aug. 26, 2013) (quoting, Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 869 (6th Cir. 2007)). "After the prima facie case is made, the burden shifts to the employer to prove that the 'challenged job criterion is essential' (defeating the employee's showing in (b)) or that the proposed accommodation will impose an undue hardship upon the employer." Id.

In this case, Plaintiff seeks to prove his disability claim based upon direct evidence, while Defendants argue that Plaintiff cannot establish his ADA claim under the indirect, burden-shifting paradigm. However, "'[t]he direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both.'" Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 453 (6th Cir. 2004) (citation omitted). Thus, "[i]f a plaintiff can produce direct evidence of discrimination then the McDonnell Douglas-Burdine paradigm is of no consequence." Id.

The Court finds as a matter of law that Plaintiff has provided direct evidence of an ADA violation. "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." Rowan v. Lockeed Martin Energy Sys. Inc., 260 F.3d 544, 548 (6th Cir. 2004). That is, "'direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice

against members of the protected group.'" Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 915 (6th Cir. 2013) (quoting, Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003)). Thus, by way of examples, courts have found that (1) a supervisor's alleged statement that she chose a particular candidate in order "to maintain racial balance" constituted direct evidence of discriminatory intent, Taylor v. Board of Educ. of Memphis City Schools, 240 Fed. Appx. 717, 720 (6th Cir. 2012); (2) a supervisor's alleged statement that an Italian-American probationary employee was a "dirty wop" and that there were too many "dirty wops" working at the facility constituted direct evidence of national origin discrimination, and the supervisor's alleged statement that a 46 year old employee was "no spring chicken" and he would never be a supervisor because of his age was direct evidence of age discrimination, DiCarlo v. Potter, 358 F.3d 408, 471 & 418 (6th Cir. 2004); and (3) providing an employee who intended to return from medical leave with a letter which stated that "given [that] you are unable to perform the tasks of your job, we have found it necessary to hire someone to fill the vacancy created by your need to take long term disability" and that "[d]ue to your long term disability we must terminate your employment" constituted direct evidence of disability discrimination under the ADA, Coffman v. Robert J. Young Co., Inc., 871 F.Supp.2d 703, 709 & 713 (M.D. Tenn. 2012).

Here, Jones' June 18, 2011, letter is direct evidence of disability discrimination, and Operation Manager Lay's August 1, 2011 handwritten statement may be as well. In both, the authors specifically state that Plaintiff is being terminated for medical reasons, and that his medical needs cannot be accommodated at the car wash.

In response to Plaintiff's Motion for Summary Judgment (and in support of its own Motion), Defendants do not challenge Plaintiff's characterization of the letter as being direct evidence.

Rather, they argue that Plaintiff has not established that he is disabled, that the only impairment he has is in breathing but that condition is not disabling, and that Jones is entitled to the "same actor" inference.[5]

In regard to disability, Defendants wholly ignore that the ADA prohibits discrimination against those regarded (or perceived) as being disabled. Specifically, under the ADA Amendments Act of 2008, which became effective January 2, 2009, a disability means

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102 (1). Paragraph 3, in turn, provides in relevant part that "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'" 42 U.S.C. § 12102(3). Thus, through the 2008 Amendments, "Congress expressly rejected" the idea that to be "regarded as" having a disability, the employer must perceive the individual to be substantially limited in a major life activity. Brown v. City of Jacksonville, 711 F.3d 883, 889 (8th Cir. 2013); see, Dulaney v. Miami-Dade County, 481 Fed. Appx. 486, 489 n.3 (11th Cir. 2012).

In this case, there is no question that Jones' perceived or regarded Plaintiff as being disabled.

---

[5] Fully one-third of Defendants' opening brief is devoted to arguing that Plaintiff is not entitled to back pay because he allegedly failed to mitigate his damages and that, by filing a claim for Social Security Disability in which he claimed he was unable to work, he has acted inconsistently with his assertion in this case that he could perform his duties at the car wash. Leaving aside that the request for disability was filed almost six months after his termination, whether Plaintiff's damages should be reduced does not go to the question of liability.

He knew of Plaintiff's numerous medical issues and, more pertinently, he terminated Plaintiff because of his "heart issues" and "health issues." Furthermore, based solely upon his understanding of those "issues," Jones concluded that Plaintiff simply could not work at any of his car washes.

Jones' blanket statement that Plaintiff could not work at Champion suggests yet another violation of the ADA. The ADA requires employers to engage in an interactive process, a duty which "is mandatory and 'requires communication and good-faith exploration of possible accommodations.'" Keith v. County of Oakland, 703 F.3d 918, 929 (6th Cir. 2013) (citation omitted). "The purpose of this process is to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" Klieber, 485 F.3d at 871. As the name suggests, the process involves communication among all concerned, yet it appears that Defendants did not engage in any such dialogue with Plaintiff. See, Jones v. Nissan No. Amer., Inc., 438 Fed. Appx. 338, 401 (6th Cir. 2011) (employee was entitled to judgment as a matter of law where, among other thing, the "record reflect[ed] a complete lack of evidence that [the employer] took any steps to ascertain [the employee's] medical condition"); 29 C.F.R. § 1630.2o(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation.").[6]

---

[6] Whether the employer's failure to engage in the interactive process constitutes an independent ground to support an ADA violation appears to be an open question in the Sixth Circuit. Compare, Wariad v. Justice and Pub. Safety Cabinet, 509 Fed. Appx. 527, 532 n.1 (6th Cir. 2013) ("an interactive-process argument simply does not create an independent ground to support an ADA violation beyond standard reasonable-accommodation analysis") with Keith, 703 F.3d at 929 (district court's statement that "'[t]he Sixth Circuit follows the view that a failure to engage in the interactive process is not an independent violation of the ADA,'" and that if an employee fails to propose a reasonable accommodation the employer's failure "to engage in the interactive process [does] not constitute a violation of the ADA . . . is erroneous because it rests upon an incorrect premise.").

The "same actor" inference relied upon by Defendants does not preclude summary judgment in Plaintiffs' favor. That inference was adopted by the Sixth Circuit in Buhrmaster v. Overnite Trans. Co., 61 F.3d 461, 464 (6th Cir. 1995) and allows a court "to infer a lack of discrimination from the fact that the same individual both hired and fired the employee." Id. at 463. Later, in Wexler v. White's Fine Furniture, Inc., 317 F.3d 564 (6th Cir. 2003), the Sixth Circuit, *en banc*, canvassed the law in the area and joined those circuits which had "minimized the importance of the same-actor inference, emphasizing that although a court may infer an absence of discrimination where the same individual hired and fired the plaintiff, such an inference is not required." Id. at 573. Thus, the inference "is by no means a mandatory one, and it may be weakened by other evidence." Id.

Here, whatever inference of non-discrimination that may be derived from the fact that Jones both hired and fired Plaintiff is eviscerated by the fact that, according to the letter, he fired Plaintiff because of his medical conditions and, based upon his perception of those medical issues, unilaterally determined that Plaintiff was unable to work.

The Sixth Circuit has stated that "[w]hen a plaintiff offers direct evidence of discrimination, 'the case should proceed as an ordinary civil matter[,]'" Wharton v. Gorman-Rupp Co., 309 Fed. Appx. 990, 996 (6th Cir. 2009) (citation omitted), and that "[w]here the plaintiff presents direct evidence that his disability was a factor in an adverse employment decision, . . .the burden then shifts to the employer to establish the business necessity of its decision, or to show that it was justified by wholly legitimate concerns." Beery v. Associated Hygienic Products, LLC, 243 Fed. Appx. 129, 133 (6th Cir. 2007) (citation omitted). Defendant argues that it was justified in terminating Plaintiff's employment because he had been counseled for being rude to customers and he failed to heed instructions not to sit out in the sun.

11

Forgetting that these purported justifications were raised after the fact and "[s]hifting justifications over time calls the credibility of those justifications into question," Cicero v. Borg–Warner Auto., Inc., 280 F.3d 579, 592 (6th Cir. 2002), the only explanation offered for Plaintiff's termination at the time the decision was made was that he was fired due to medical reasons. This is significant because to establish an ADA disability claim, Plaintiff is not required to show that his disability (or perceived disability) was the sole reason for his termination. Lewis v. Humboldt Acquisition Corp., Inc., 681 F.3d 312, 317 (6th Cir. 2012). Rather, he is required to prove that he was terminated "because of" a disability (or perceived disability); that is, his disability (or perceived disability) was a "'but-for' cause of the employer's adverse decision.'" Id. at 321 (quoting, Gross v. FBL Finan. Serv., Inc., 577 U.S. 167, 176 (2009)). In light of Jones' June 18, 2011, letter, any reasonable jury would have no choice but to conclude that Plaintiff was terminated because of his perceived disability and that, "but for" that perception, Plaintiff would not have been terminated on June 19, 2011.

Accordingly, Plaintiff is entitled to summary judgment on his ADA claim.[7] In light of this finding on liability, the Court will set a status conference to address how the parties wish to go forward on Plaintiff's damages claim under the ADA.

**B. Retaliation Claim**[8]

---

[7] The Court notes that nothing in the record suggests that Defendants acted with ill-will or malice, Rather, it suggests that they acted out of ignorance of the requirements of the ADA.

[8] It is unclear whether Plaintiff intends to pursue his retaliation claim in light of the fact that the Court finds liability in his favor on the ADA claim. This matter, too, will be addressed at the status conference.
    Additionally, the parties focus exclusively on Plaintiff's ADA retaliation claim. To the extent that Plaintiff intends to pursue a retaliation claim under the TDA, that claim likely fails because he alleges that he was retaliated against after requesting a reasonable accommodation. Requesting a reasonable accommodation under the TDA is not a protected activity, and does not support a retaliation claim. Burress v. City of Franklin, 809 F. Supp.2d 795, 818 (M.D. Tenn. 2011). The Court will address this issue at the

The ADA prohibits retaliation against an employee who opposes practices made unlawful by the Act. 42 U.S.C. § 12203. Where, as here, there is no direct evidence of retaliation,[9] a plaintiff must establish a *prima face* case by showing that "(1) []he engaged in a protected activity; (2) []he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action." Bryson v. Regis Corp., 498 F.3d 561, 577 (6th Cir. 2007). "If a plaintiff presents indirect evidence to establish her prima facie case . . . the burden-shifting framework of McDonnell Douglas Corp. . . . applies," meaning that "the defendant must produce evidence of a legitimate, non-discriminatory reason for its adverse action, after which the plaintiff must show by a preponderance of the evidence that the proffered legitimate reason was not the true reason for the adverse employment action, but merely a pretext for retaliation." White v. Standard Ins. Co., 2013 WL 3242297 at * 3 (6th Cir. June 28, 2013) (internal citation to McDonnell Douglas omitted).

In both his EEOC charge and in his Complaint, Plaintiff claims that he was retaliated against after he requested that he be moved to the Bellevue car wash to accommodate his medical conditions. There are obvious question of fact which preclude summary judgment on this claim.

As a preliminary matter, there is a dispute as to whether Plaintiff asked to be moved to Bellevue to accommodate his medical needs, or whether he asked to be moved so that he could work the morning shift. There is also a factual dispute as to the reason why Plaintiff was not moved: was it because he had requested an accommodation, or because the Bellevue job was more demanding, Plaintiff had not performed well there in the past, and customer complaints had been leveled against

---

conference as well.

[9] Jones' letter says nothing about Plaintiff having engaged in protected activity or making any request for an accommodation.

Plaintiff at about this same time? This inquiry necessarily segues into the ultimate question of whether the reason proffered for the failure to transfer was but a pretext for retaliating against him for requesting an accommodation. As such, summary judgment will not be granted on Plaintiff's retaliation claim.

### III. CONCLUSION

On the basis of the foregoing, Plaintiff's Motion for Summary Judgment on his claim for liability under the ADA will be granted, and Defendants' Motion for Summary Judgment on all of Plaintiff's claims will be denied. The Court will set a status conference to (1) hear from Plaintiff as to whether he intends to pursue his remaining claims in light of the liability ruling on his ADA claim, and (2) discuss the future proceedings that may be necessary relating to Plaintiff's claim for damages.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE